## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| BARRY JEFFRIES, individually and on behalf of all others similarly situated, | Case No. 2:24-cv-00013 |
| | **JURY TRIAL DEMANDED** |
| Plaintiff, | |
| v. | |
| ZEROED-IN TECHNOLOGIES, LLC, | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Barry Jeffries ("Plaintiff") brings this Class Action Complaint on behalf of himself, and all others similarly situated, against Defendant Zeroed-In Technologies, LLC ("Zeroed-In" or "Defendant"), alleging as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to him, which are based on personal knowledge:

## NATURE OF THE CASE

1.      Plaintiff brings this class action against Zeroed-In for its failure to properly secure and safeguard its customers' employees' sensitive personally identifiable information, including current and former employee's information provided to Zeroed-In such as names, Social Security numbers, account numbers, and/or similar information (collectively, "PII").

2.    Zeroed-In is an American company specializing in cloud-based human resources ("HR") and workforce data analytics, whereby Zeroed-In is hired to collect and analyze data about those employed by its customers.[1]

3.    Zeroed-In was founded in 2004 and has grown to employ over 25 people, generating approximately $5 million in revenue annually.[2]

4.    While employed by customers of Zeroed-In, Plaintiff and Class Members are required to provide their employers with their PII. The employers then convey that PII to Zeroed-In as part of Zeroed-In's data analytic functions. As such, Zeroed-In knowingly collects and stores a litany of highly sensitive PII from its customers' employees. Because of this, Zeroed-In has a duty to secure, maintain, protect, and safeguard the PII that it collects and stores against unauthorized access and disclosure through reasonable and adequate data security measures.

5.    Despite Zeroed-In's duty to safeguard the PII of its customers' current and previous employees, Plaintiff and Class Members' PII was compromised in a data breach that Defendant became aware of on or about August 8, 2023, during

---

[1] *How it Works*, ZeroedIn, available at: https://www.ZeroedIn.com/how-it-works/ (last accessed January 4, 2024).

[2] *ZeroedIn Technologies Notifies 1.9 Million Consumers of Data Breach Affecting Their SSNs*, JD Supra (November 28, 2023), available at: https://www.jdsupra.com/legalnews/ZeroedIn-technologies-notifies-1-9-1390357/ (last accessed January 4, 2024).

which a threat actor gained access to Zeroed-In's computer systems (the "Data Breach").[3]

6.    The data breach occurred in part because Zeroed-In stored Plaintiff's and Class Members' PII in an unencrypted, Internet-accessible environment on its public network,[4] despite Zeroed-In's claim that it is "committed to protecting the privacy of [employee] information."[5]

7.    After Zeroed-In discovered the Data Breach on or around August 8, 2023, Defendant determined that the threat actors initially gained access to its systems on August 7, 2023.[6]

8.    Despite learning about the breach in August of 2023, Zeroed-In waited until almost four months later—on or about November 27, 2023—to begin notifying impacted individuals of the unauthorized access.[7]

9.    Based on publicly available information, the PII impacted by the Data Breach includes a wide swath of highly sensitive information belonging to Zeroed-

---

[3] Ernesto Naprys, *Almost two million affected by data company ZeroedIn Technologies Breach*, Cybernews (November 28, 2023), available at: https://cybernews.com/security/almost-two-million-affected-ZeroedIn-technologies-breach/ (last accessed January 4, 2024).

[4] *ZeroedIn Technologies, Dollar Tree under investigation for data breach of 1.9 million employee and customer records*, Security Info Watch (December 11, 2023), available at: https://www.securityinfowatch.com/cybersecurity/press-release/53080312/ZeroedIn-technologies-dollar-tree-under-investigation-for-data-breach-of-19-million-employee-and-customer-records (last accessed January 4, 2024).

[5] *Privacy Policy*, ZeroedIn, available at: https://www.ZeroedIn.com/privacy-policy/ (last accessed January 4, 2024).

[6] *Id.*

[7] *ZeroedIn Technologies, Dollar Tree under investigation for data breach of 1.9 million employee and customer records*, *supra* note 4.

In's customers' employees, including their names, dates of birth, and Social Security numbers.[8]

10.     As a direct and proximate result of Defendant's failure to implement and follow basic security procedures, Plaintiff's and Class Members' PII is now exposed to cybercriminals.

11.     Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, intrusion of their health privacy, and similar forms of criminal mischief, risk which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

12.     Plaintiff, on behalf of himself and all others similarly situated, alleges claims for negligence, negligence *per se*, and declaratory judgment arising from the Data Breach. Plaintiff seeks damages and injunctive relief, including the adoption reasonably sufficient practices to safeguard PII in Defendant's custody to prevent incidents like the Data Breach from reoccurring in the future, and for Defendant to provide identity theft protective services to Plaintiff and Class Members for their lifetimes.

---

[8] *Id.*

## **PARTIES**

13.    Plaintiff Barry Jeffries is an adult, who at all relevant times, was a resident and citizen of the State of Tennessee. Plaintiff is a former employee of one of Defendant's customers. Plaintiff received a data breach notice informing him that his PII provided to Zeroed-In was compromised during the Data Breach.

14.    Plaintiff has suffered actual injury from having his PII exposed and/or stolen as a result of the Data Breach, including: (1) required mitigation efforts, including researching the Data Breach and needing to monitor his financial statements to ensure his information is not used for identity theft and fraud; (b) damages to and diminution of the value of his PII, a form of intangible property that loses value when it falls into the hands of criminals; (c) loss of privacy; and (d) continuous imminent and impending injury raising from increased risk of financial identity theft and fraud.

15.    As a direct and proximate result of the Data Breach, Plaintiff has also received a significant increase in spam calls since the Data Breach. Plaintiff noticed that this was a considerable increase from the amount of spam calls he received before the Data Breach.

16.    As a result of the Data Breach, Plaintiff will continue to be at a substantial and certainly impending risk for fraud and identity theft, and their attendant damages, for years to come.

17.    Defendant Zeroed-In Technologies, LLC is a Florida limited liability company with a principal place of business located at 11037 Harbor Yacht Ct. #201, Fort Myers, FL 33908.

18.    Defendant's sole managing member is Christopher Moore, who is a citizen of Fort Myers, Florida. Defendant is a citizen of the state in which its member resides. Therefore, Defendant is a citizen of Florida.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class is a citizen of a state different than Defendant.

20.    This Court has personal jurisdiction over Defendant because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendant resides in this District.

21.    Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendant resides in this District.

## FACTUAL BACKGROUND

22.     Zeroed-In provides data analytics to an array of employers, offering "clarity through trustworthy data" to its employer customers so that they can "overcome [their] most vital workforce challenges today."[9]

23.     To analyze its customers' workforce data, Zeroed-In collects and stores the PII of its customers' employees, including their names, dates of birth, and Social Security numbers.

24.     Per Zeroed-In's website, the company's software can directly extract data from its customers' HR and operational systems, including widely used HR applications produced by companies like ADP, Ceridian, Salesforce, and Workday.[10]

25.     Plaintiff and Class Members are and/or were employees of companies and entities that used Zeroed-In's services to collect, manage and analyze their workforce data.

26.     As a condition of their employment, Plaintiff and Class Members directly or indirectly entrusted their employers with their sensitive PII.

27.     Plaintiff's and Class Members' employers then permitted Zeroed-In to collect this PII to engage in data analysis on the employers' behalf.

---

[9] ZeroedIn, available at: https://www.ZeroedIn.com/ (last accessed January 4, 2024).
[10] *Id.*

28.   In turning over their PII, Plaintiff and Class Members reasonably expected that their employers and third-party vendors used by their employers would safeguard their highly sensitive information.  Likewise, their employers reasonably expected that Zeroed-In would safeguard the highly sensitive employee information that Zeroed-In was allowed to extract and maintain possession of.

29.   By obtaining, collecting, and storing Plaintiff's and Class Members' PII, Zeroed-In assumed equitable and legal duties to safeguard Plaintiff's and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

30.   Despite these duties, Zeroed-In failed to implement reasonable data security measures to protect Plaintiff's and Class Members' PII and ultimately allowed threat actors to breach its computer systems and exfiltrate Plaintiff's and Class Members' PII.

**A.   The Value of Private Information and Effects of Unauthorized Disclosure.**

31.   Zeroed-In understood that the PII it collects was highly sensitive and of significant value to those who would use it for wrongful purposes.

32.   Zeroed-In also knew that a breach of its computer systems, and exposure of the PII stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII was compromised.

33.    These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at business such as Equifax, Facebook, Yahoo, Marriott, Anthem, and many others.

34.    PII has considerable value and constitutes an enticing and well-known target to hackers. Hackers easily can sell stolen data as there has been "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[11]

35.    As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identity theft, and medical and financial fraud.[12]

36.    The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2021, there were 4,145 publicly disclosed data breaches, exposing 22 billion records. The United States specifically saw a 10% increase in the total number of data breaches.[13]

37.    Indeed, a 2022 poll of security executives predicted an increase in attacks over the next two years from "social engineering and ransomware" as nation-

---

[11]  Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/ (last accessed January 4, 2024).

[12] https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last accessed January 4, 2024).

[13]*Data Breach Report: 2021 Year End*, Risk Based Security (Feb. 4, 2022), https://www.riskbasedsecurity.com/2022/02/04/data-breach-report-2021-year-end/ (last accessed January 4, 2024).

states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[14]

38.    In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[15]

39.    The ramifications of Zeroed-In's failure to keep Plaintiff's and Class Members' PII secure are long-lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years.

---

[14] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need to Know*, Forbes (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864 (last accessed January 4, 2024).
[15] *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20, (last accessed January 4, 2024).

As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[16]

40.     Even if stolen PII does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

41.     The specific types of personal data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and other Class Members especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

42.     **Social Security Numbers**—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique Social Security Numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major

---

[16] U.S. Gov't Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/new.items/d07737.pdf, (last accessed January 4, 2024).

inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

43.   Indeed, the Social Security Administration warns that the process of replacing a Social Security is a difficult one that creates other types of problems, and that it will not be a complete remedy for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[17]

---

[17] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed January 4, 2024).

44.     Social Security Numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often social security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

45.     Based on the value to cybercriminals of the employee PII in its possession, Zeroed-In knew or should have known the importance of safeguarding the PII entrusted to it and of the foreseeable consequences if its data security systems were breached. Zeroed-In failed, however, to take adequate cyber security measures to prevent the Data Breach from occurring.

**B.      Zeroed-In Breached its Duty to Protect Customers' Employees' PII.**

46.     On or about August 8, 2023, Zeroed-In became aware of a cybersecurity event that was believed to have begun on August 7, 2023.[18]

47.     After becoming aware of the Data Breach, Zeroed-In launched an investigation into the breach, which lasted until August 31, 2023.[19]

---

[18] *ZeroedIn Technologies, Dollar Tree under investigation for data breach of 1.9 million employee and customer records, supra* note 4.
[19] *Almost two million affected by data company ZeroedIn Technologies Breach, supra* note 3.

48.     According to Zeroed-In, during the Data Breach, a threat actor gained access to its systems without authorization and might have obtained certain personal information of the employees of Zeroed-In's customers.[20]

49.     The employee information compromised during the Data Breach includes, at the very least, personal information provided to Zeroed-In including names, Social Security numbers, and dates of birth.[21]

50.     On or around November 27, 2023, nearly four months after the Data Breach began, Zeroed-In reported the Data Breach to the Office of the Maine Attorney General, indicating the Data Breach compromised the PII of approximately 1.9 million customer employees.[22]

51.     On or around that date, Plaintiff received a notice informing him that his PII had been compromised during the Data Breach.

52.     Upon information and belief, Class Members received similar notices informing them that their PII was compromised during the Data Breach.

53.     The Data Breach occurred as a direct result of Zeroed-In's failure to implement and follow basic security procedures to protect the employee PII that its customers had allowed Zeroed-In to harvest, analyze, and store.

---

[20] *Id.*

[21] *Id.*

[22] *Data Breach Notifications*, Office of the Main Attorney General, https://apps.web. maine.gov/online/aeviewer/ME/40/b3993ddd-2443-4645-ae45-f36dc7686236.shtml         (last accessed January 4, 2024).

**C.**    **FTC Guidelines Prohibit Zeroed-In from Engaging in Unfair or Deceptive Acts or Practices, Including Failing to Protect Sensitive Consumer Information in their Possession.**

54.    Zeroed-In is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

55.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[23]

56.    Among other guidance, the FTC recommends the following cybersecurity guidelines for businesses in order to protect sensitive information in their systems:[24]

      a.    Identify all connections to the computers where sensitive information is stored;

---

[23] *Start with Security – A Guide for Business*, United States Federal Trade Comm'n (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf   (last accessed January 4, 2024).

[24] *Protecting Personal Information: A Guide for Business*, United States Federal Trade Comm'n, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed January 4, 2024).

b.  Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

c.  Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business;

d.  Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine;

e.  Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks;

f.  Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet;

g.  Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically;

h.  Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day; and

i.   Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business's network, the transmission should be investigated to make sure it is authorized.

57.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[25]

58.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

59.    Zeroed-In failed to properly implement basic data security practices. Zeroed-In's failure to employ reasonable and appropriate measures to protect against unauthorized access to its customers' employees' PII constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

---

[25] *Id.*

60.     Zeroed-In was at all times fully aware of its obligations to protect the PII of its customers' employees given the reams of PII that it had access to as an HR analytics company, as evidenced by its promise to customers to maintain HR information in a "secure environment."[26] Zeroed-In was also aware of the significant repercussions that would result from a failure to properly secure its cloud-based data.

**D.     Plaintiff and Class Members Suffered Damages.**

61.     The ramifications of Zeroed-In's failure to keep PII secure are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

62.     Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's conduct. Further, the value of Plaintiff's and Class members' PII has been diminished by its exposure in the Data Breach.

63.     Plaintiff and Class members are at substantial increased risk of suffering identity theft and fraud or misuse of their PII as a result of the Data Breach. From a recent study, 28% of individuals affected by a data breach become victims

---

[26] *Why ZeroedIn*, ZeroedIn, available at: https://www.ZeroedIn.com/why-zeroedin/ (last accessed January 4, 2024).

of identity fraud—this is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity fraud. Without a data breach, the likelihood of identify fraud is only about 3%.[27]

64.     Further, Plaintiff and Class members have incurred and will incur out of pocket costs for protective measures, such as identity theft protection, credit monitoring, credit report fees, credit freeze fees, and similar costs related to the Data Breach.

65.     Besides the monetary damage sustained in the event of identity theft, consumers may have to spend hours trying to resolve identity theft issues. For example, the FTC estimates that it takes consumers an average of 200 hours of work over approximately six months to recover from identity theft.[28]

66.     Plaintiff and Class members are also at a continued risk because their information remains in Zeroed-In's systems, which the Data Breach showed are susceptible to compromise and attack and are subject to further attack so long as Zeroed-In fails to take necessary and appropriate security and training measures to protect the PII in its possession.

---

[27]    Stu Sjouwerman, *28 Percent of Data Breaches Lead to Fraud*, KnowBe4, https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud (last accessed January 4, 2024).
[28]    Kathryn Parkman, *How to Report identity Theft*, ConsumerAffairs (Feb. 17, 2022), https://www.consumeraffairs.com/finance/how-to-report-identity-theft.html (last accessed January 4, 2024).

67.     Plaintiff and Class members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private information to strangers.

68.     As a result of Zeroed-In's failure to prevent the Data Breach, Plaintiff and Class members have suffered and will continue to suffer injuries, including out of pocket expenses; loss of time and productivity through efforts to ameliorate, mitigate, and deal with the future consequences of the Data Breach; theft of their valuable PII; the imminent and certainly impeding injury flowing from fraud and identity theft posed by their PII being disclosed to unauthorized recipients and cybercriminals; damages to and diminution in value of their PII; and continued risk to Plaintiff's and the Class members' PII, which remains in the possession of Defendant and which is subject to further breaches so long as Zeroed-In fails to undertake appropriate and adequate measures to protect the PII entrusted to it.

## CLASS ALLEGATIONS

69.     Plaintiff brings this class action on behalf of himself and all other individuals who are similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.

70.     Plaintiff seeks to represent a class of persons to be defined as follows:

> All individuals in the United States whose PII and/or PHI was compromised in the Zeroed-In Data Breach which was discovered on or about August 8, 2023 (the "Class").

71.    Excluded from the Class are Zeroed-In, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

72.    This proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when he moves for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

73.    **Numerosity:** Plaintiff is informed and believes, and thereon alleges, that there are at minimum, hundreds of thousands of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Defendant's records, including but not limited to the files implicated in the Data Breach, but based on public information, the Class includes approximately 1.9 million individuals.

74.    **Commonality:** This action involved questions of law and fact common to the Class. Such common questions include but are not limited to:

        a.    Whether Defendant had a duty to protect the PII of Plaintiff and
              Class Members;

b.      Whether Defendant was negligent in collecting and storing Plaintiff's and Class Members' PII, and breached its duties thereby;

c.      Whether Plaintiff and Class Members are entitled to damages as a result of Defendant's wrongful conduct; and

d.      Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct.

75.     **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and members of the Class were all employees of Defendant's customers, and each had their PII exposed and/or accessed by an unauthorized third party.

76.     **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the members of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and has no interests antagonistic to the members of the Class. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical as explained above.

77.     **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

78.     **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendant breached its duty to Plaintiff and Class Members, then Plaintiff and each Class member suffered damages by that conduct.

79.     **Injunctive Relief:** Defendant has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

80.    **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through Defendant's books and records.

## FIRST CAUSE OF ACTION
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

81.    Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

82.    Defendant owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. More specifically, this duty including, among other things: (a) designing, maintaining, and testing its security systems to ensure that Plaintiff's and Class Members' PII in Defendant's possession was adequately secured and protected; (b) implementing processes that would detect a breach of its security system in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

83.    Zeroed-In had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable

and probable victims of any inadequate security practices on the part of Defendant. By collecting and storing valuable PII that is routinely targeted by cybercriminals for unauthorized access, Defendant was obligated to act with reasonable care to protect against these foreseeable threats.

84.     Zeroed-In breached the duties owed to Plaintiff and Class Members and thus was negligent. Defendant breached these duties by, among other things, failing to: (a) exercise reasonable care and implement adequate security systems, protocols and practices sufficient to protect the PII of Plaintiff and Class Members; (b) detect the Data Breach while it was ongoing; (c) maintain security systems consistent with industry standards; and (d) disclose that Plaintiff's and Class Members' PII in Defendant's possession had been or was reasonably believed to have been, stolen or compromised.

85.     But for Zeroed-In's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII would not have been compromised.

86.     As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries, including:

     a.     Theft of their PII;

     b.     Costs associated with requested credit freezes;

     c.     Costs associated with the detection and prevention of identity theft and unauthorized use of the PII;

d.   Costs associated with purchasing credit monitoring and identity theft protection services;

e.   Lowered credit scores resulting from credit inquiries following fraudulent activities;

f.   Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

g.   The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of cyber-criminals;

h.   Damages to and diminution in value of their PII entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others; and

> i.   Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

87.   As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Class)**

88.   Plaintiff restates and realleges all preceding factual allegations above as if fully set forth herein.

89.   Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by institutions such as Defendant or failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendant's duty.

90.   Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of

PII it obtained and stored and the foreseeable consequences of a data breach within the HR sector.

91.     Plaintiff and Class Members are consumers within the class of persons Section 5 of the FTC Act (and similar state statutes) was intended to protect.

92.     Moreover, the harm that has occurred is the type of harm that the FTC Act (and similar state statutes) was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

93.     Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

94.     As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
### DECLARATORY JUDGMENT
**(On Behalf of Plaintiff and the Class)**

95.     Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

96.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

97.     An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and whether Zeroed-In is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff alleges that Zeroed-In's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of his PII and remains at imminent risk that further compromises of his PII will occur in the future.

98.     Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

> a. Zeroed-In owes a legal duty to secure customers' employees' PII and to timely notify impacted individuals of a data breach under the common law, Section 5 of the FTC Act, and various state statutes; and

> b. Zeroed-In continues to breach this legal duty by failing to employ reasonable measures to secure PII in its possession.

29

99.    This Court also should issue corresponding prospective injunctive relief requiring Zeroed-In to employ adequate security protocols consistent with law and industry standards to protect PII in Zeroed-In's data cloud.

100.    If an injunction is not issued, Plaintiff will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Zeroed-In. The risk of another such breach is real, immediate, and substantial. If another breach at Zeroed-In occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and he will be forced to bring multiple lawsuits to rectify the same conduct.

101.    The hardship to Plaintiff if an injunction is not issued exceeds the hardship to Zeroed-In if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Zeroed-In of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Zeroed-In has a pre-existing legal obligation to employ such measures.

102.    Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach at Zeroed-In, thus eliminating the additional injuries that would result to Plaintiff and employees whose confidential information would be further compromised.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all other similarly situated, prays for relief as follows:

    a.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

    b.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

    c.    For damages in an amount to be determined by the trier of fact;

    d.    For an order of restitution and all other forms of equitable monetary relief;

    e.    Declaratory and injunctive relief as described herein;

    f.    Awarding Plaintiff reasonable attorneys' fees, costs, and expenses;

    g.    Awarding pre- and post-judgment interest on any amounts awarded; and

    h.    Awarding such other and further relief as may be just and proper.

## <u>JURY TRIAL DEMANDED</u>

A jury trial is demanded on all claims so triable.


Dated: January 4, 2024                          Respectfully submitted,

                                                */s/ Nicholas A. Colella*
                                                Gary F. Lynch (*pro hac vice* forthcoming)
                                                Nicholas A. Colella (FL Bar No. 1002941)
                                                **LYNCH CARPENTER, LLP**
                                                1133 Penn Ave, 5th Floor
                                                Pittsburgh, PA 15222
                                                T: 412-322-9243
                                                gary@lcllp.com
                                                nickc@lcllp.com

                                                *Attorneys for Plaintiff*